**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

DUANE STONESTREET,

     Plaintiff,

     vs.                                     Civ. No. 19-230 KK

ANDREW SAUL, Commissioner
of the Social Security Administration,

     Defendant.

## MEMORANDUM OPINION AND ORDER[1]

THIS MATTER is before the Court on Plaintiff Duane Stonestreet's ("Mr. Stonestreet") Motion to Reverse and Remand for Rehearing with Supporting Memorandum (Doc. 21) ("Motion"), filed September 9, 2019, seeking review of the unfavorable decision of Defendant Andrew Saul, Commissioner of the Social Security Administration ("Commissioner"), on Mr. Stonestreet's claim for Title XVI supplemental security income under 42 U.S.C. §§ 405(g) and 1383(c)(3). The Commissioner filed a response in opposition to the Motion on December 13, 2019 (Doc. 27), and Mr. Stonestreet filed a reply in support of the Motion on December 30, 2019. (Doc. 28.) Having meticulously reviewed the entire record and the applicable law and being otherwise fully advised in the premises, the Court FINDS that Mr. Stonestreet's Motion is well taken and should be GRANTED.

## I.    Background

### A.    Procedural History

In December 2014, Mr. Stonestreet filed an application with the Social Security Administration ("SSA") for supplemental security income ("SSI"). (Administrative Record

---

[1] Pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have consented to the undersigned to conduct dispositive proceedings and order the entry of final judgment in this case. (Doc. 9.)

("AR") 094.) He alleged a disability onset date of August 12, 2014 due to a back injury and severe depression. (AR 082.) Disability Determination Services ("DDS") determined that Mr. Stonestreet was not disabled both initially (AR 111) and on reconsideration (AR 120). Mr. Stonestreet requested a hearing with an Administrative Law Judge ("ALJ") on the merits of his application. (AR 126.)

ALJ Ann Farris held a hearing on August 3, 2017. (AR 042-81.) Mr. Stonestreet, his mother, and Vocational Expert Tammie Donaldson testified. (*Id.*) The ALJ issued an unfavorable decision on February 16, 2018. (AR 014-36.) The Appeals Council denied Mr. Stonestreet's request for review on January 16, 2019 (AR 001-4), making the ALJ's decision the final decision of the Commissioner from which Mr. Stonestreet appeals. *See Doyal v. Barnhart*, 331 F.3d 758, 759 (10th Cir. 2003).

**B.     Mr. Stonestreet's Background and Mental Health History[2]**

Mr. Stonestreet is a thirty-six-year-old man who completed high school through the tenth grade and obtained a general equivalency degree, or GED, in 2000. (AR 219, 516.) He has principally worked as a construction laborer, warehouse dock worker, and bundler operator in a factory. (AR 049-52, 219.) In 2007, Mr. Stonestreet broke his back while doing construction work, after which he was laid off and had no significant reported income for nearly three years. (AR 061-62, 203-204.) Following his back injury, Mr. Stonestreet experienced a "second occurrence" of depression, the first having occurred when he was fifteen years old following his parents' divorce. (AR 503.) Mr. Stonestreet resumed work in 2011, working at a food pantry, and briefly worked

---

[2] Although Mr. Stonestreet alleged disability due to physical as well as mental impairments, he challenges no aspect of the ALJ's decision regarding his physical impairments; therefore, the Court focuses its discussion on the evidence related to Mr. Stonestreet's mental impairments.

part time as a dishwasher at Hooter's in 2012 but was fired in March of that year for missing too much work. (AR 049, 067, 203-204, 342.)

Also in 2012, Mr. Stonestreet's marriage of ten years—which produced two children, then in elementary school—ended in divorce.[3] (AR 342, 567; *see* AR 432, 503 (indicating ages of children).) He lost his home, received a second DUI, and, in August, was hospitalized after he attempted suicide via intentional overdose of his blood pressure medication. (AR 503, 535.) He reported to one mental health provider that "[s]ince 2012, he feels low and depressed most of the time, has frequent nightmares, has low appetite and has to force himself to eat, . . . often feels angry and irritable, but tries hard not to act out on these feelings[,] . . . [and] frequently withdraws from friends and family[.]" (AR 567.)

In 2014, Mr. Stonestreet began receiving mental health services at St. Martin's Hospitality Center after being referred through the Specialty Courts program. (AR 501-503, 521.) He was diagnosed with major depressive disorder (recurrent and severe with melancholic features) and post-traumatic stress disorder ("PTSD") (AR 503, 509-11), and was prescribed hydroxyzine to treat his anxiety, mirtazapine to treat his depression, and prazosin to treat his nightmares. (AR 295, 425, 450.) In July 2015, Mr. Stonestreet's primary care physician, Anthony Fleg, M.D., took over his medication management after Mr. Stonestreet was discharged from St. Martin's. (AR 424-47, 521.)

In his treatment notes from Mr. Stonestreet's March 24, 2016 visit, Dr. Fleg described Mr. Stonestreet's behavioral health symptoms as "stable over [the] last year" and noted that Mr. Stonestreet "has not taken meds in the past months." (AR 551.) However, in late April 2016, Mr. Stonestreet was hospitalized following another suicide attempt, which was "precipitated by a

---

[3] There is some discrepancy in the record regarding when the divorce was finalized. One record notes that Mr. Stonestreet reported that he was divorced in December 2011. (AR 504.)

falling out with family members that he had been living with" (AR 626), via overdose of his hypertension medication. (AR 567, 626.) Christopher Morris, Ph.D., who treated Mr. Stonestreet following his second suicide attempt, noted impressions of "persistent depressive disorder, moderate" and PTSD. (AR 568-69.) On Dr. Morris's recommendation, Dr. Fleg started Mr. Stonestreet on selective serotonin reuptake inhibitor ("SSRI") medication, a type of antidepressant. (AR 546, 567-68.)

Mr. Stonestreet saw Dr. Morris two more times. (AR 569-72.) On May 5, 2016, Dr. Morris noted that Mr. Stonestreet reported feeling "more positive with fewer negative thoughts[,]" possibly attributable to his new medication. (AR 571.) However, Mr. Stonestreet also reported having difficulty interacting with his mother and brother and what Dr. Morris described as "anxious rumination[,]" i.e., difficulty slowing and stopping his thinking, particularly at night. (AR 571-72.) Dr. Morris practiced "thought-stopping and diaphragmatic breathing" with Mr. Stonestreet and helped him develop a plan for interacting with his mother and brother by limiting his interactions with them to "superficial topics" and "excus[ing] himself from the conversation if sensitive topics arise[.]" (*Id.*) Regarding his opinion of Mr. Stonestreet's progress and overall functional status as of that date, he opined, "Good initial progress, showed for [two] appointments consecutively. Significant limitations in social and occupational functioning." (AR 572.)

On May 19, 2016, Mr. Stonestreet reported to Dr. Morris that he "feels better" and that "his family members told him the antidepressants must be working because he is talking more[.]" However, he also reported becoming anxious while attending church with his mother and having to leave halfway through the service. (AR 569.) Dr. Morris noted that "any crowded place makes him feel very anxious, for example he must time his visit to the grocery store during off hours." (*Id.*) While Dr. Morris noted that Mr. Stonestreet "has been consistent with his antidepressant

medication, . . . is using the coping skills provided[,] . . . reports a reduction in depressive symptoms[,] and displays a reduction in vegetative signs[,]" he opined that Mr. Stonestreet "still struggles with low self[-]worth, irritability, avoidance and social withdrawal, and intrusive thoughts/nightmares." (AR 570.) He trained Mr. Stonestreet in "CALM relaxation technique" and talked to him about the possibility of learning guided imagery as an alternative relaxation method. (*Id.*)

Mr. Stonestreet continued to see Dr. Fleg in 2016 and 2017 for his primary care needs, including medication management. (AR 540-47, 736-38.) Dr. Fleg consistently described Mr. Stonestreet as have "significant s[ymptoms]" of depression and PTSD and increased his antidepressant medication dosage in September 2016. (AR 541, 543, 545, 547, 737.) In October 2016, Dr. Fleg completed reenrollment forms so that Mr. Stonestreet could continue to receive medical cannabis to treat his PTSD. (AR 652-56.) In February 2017, Dr. Fleg noted that Mr. Stonestreet reported that although he continued to use the relaxation techniques he learned from Dr. Morris, he had "not been sleeping well in the last weeks[,]" which coincided with when he began having nightly calls with his children. (AR 540.) In July 2017 when Mr. Stonestreet reported continuing to be unable to sleep well due to nightmares, Dr. Fleg prescribed prazosin to help with Mr. Stonestreet's nightmares as well as his anxiety symptoms. (AR 736-37.)

## C.  Medical Opinions

### 1.  Consultative Examiner Louis Wynne, Ph.D.

Dr. Wynne examined Mr. Stonestreet on three separate occasions: (1) in February 2013 on referral from DDS[4] (AR 340-43); (2) in May 2015, again on referral from DDS (AR 353-56); and (3) in July 2017 based on Mr. Stonestreet's attorney's request for a supplemental examination.

---

[4] The February 2013 examination was performed in connection with a prior disability benefits application filed by Mr. Stonestreet.

(AR 904-906.) Across his evaluations, Dr. Wynne consistently opined that Mr. Stonestreet's ability to understand and carry out short and simple instructions was, at most, only "mildly" or "slightly" impaired. (AR 342, 356, 908.) However, regarding his diagnoses and assessment of Mr. Stonestreet's mental functional limitations, Dr. Wynne's opinions changed over time.

In relevant part, whereas Dr. Wynne initially diagnosed Mr. Stonestreet with "[m]ajor depression, single episode by history" in 2013 and did not indicate a diagnosis of depression at all in 2015, he included diagnoses of "[p]ersistent depressive disorder" and "[d]epressive disorder due to another medical condition" in his 2017 report. (AR 343, 356, 905-906.) And whereas Dr. Wynne included a diagnosis of "history of head injury; [rule out] history of exposure to organic solvents" per "claimant allegations" in 2013 and 2015, noting in 2015 that any head injury was "without apparent consequences" (AR 343, 356), Dr. Wynne changed this diagnosis to "[m]ild neurocognitive disorder due to traumatic brain injury; [rule out] exposure to hazardous substances" in 2017. (AR 905.) In his 2017 report, he explained the evolution of his diagnoses as follows:

> The consequences of head injuries and inhalant abuse are often mistaken for depression; hence my omission of depression as a diagnosis in my second report. I did not specifically include cognitive impairment due to head injuries then but, on further thought, I think that diagnosis should be included—as well as the possibility there might have been some contribution from his exposure to organic solvents.
>
> . . . .
>
> It is my opinion, then, that the depression occurring after his parents' divorce has been exacerbated by his back pain resulting from a fall with fractures to his spine as well as his life circumstances, i.e., homelessness punctuated by intermittent periods of living with his mother. This is, in other words, a complicated case with many factor[s] contributing to Duane's disability.

(AR 905.)

Regarding Mr. Stonestreet's social interaction limitations, Dr. Wynne opined in 2013 that Mr. Stonestreet "could interact with the general public but he might have difficulty interacting

with his coworkers and his supervisors." (AR 342.) In 2015, he opined that Mr. Stonestreet "could not interact well with the general public, his coworkers, or his supervisors[.]" (AR 356.) In 2017, he opined that Mr. Stonestreet has "moderate" limitations in his ability to (1) interact appropriately with the general public, and (2) accept instructions and respond appropriately to criticism from supervisors, and a "marked" limitation in his ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (AR 907.) Regarding Mr. Stonestreet's adaptation limitations, while Dr. Wynne indicated in 2013 that Mr. Stonestreet "could adapt to changes in the workplace" (AR 342), he opined in 2015 that Mr. Stonestreet "might . . . have difficulty adapting to changes in the workplace" (AR 356), and in 2017 that he has a "moderate" limitation in his ability to respond appropriately to changes in the work setting. (AR 907.)

Dr. Wynne also opined in 2017 that Mr. Stonestreet has, *inter alia*, a "moderate" limitation in the ability to sustain an ordinary routine without special supervision and "marked" limitations in the ability to (1) maintain attention concentration for extended periods, (2) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, (3) work in coordination with or proximity to others without being distracted by them, and (4) complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods. (AR 907-908.)

### 2. State Agency Reviewers

The non-examining State agency consultants who reviewed Mr. Stonestreet's claim at the initial and reconsideration levels in June and November 2015, respectively, both found that Mr. Stonestreet's affective disorder (i.e., depression) was "non-severe." (AR 089, 090, 102-103.) Neither State agency consultant completed a mental residual functional capacity assessment or

otherwise indicated that Mr. Stonestreet has any mental functional limitations of any severity. (*See id.*)

## D.    The ALJ's Decision

In her decision, the ALJ found that Mr. Stonestreet's "severe impairments" include "Depressive Disorder; Anxiety Disorder; Post-Traumatic Stress Disorder (PTSD); Neurocognitive Disorder; and Drug and Alcohol Abuse (DAA)[.]" (AR 020.) Finding that the record did not support finding any of Mr. Stonestreet's "severe impairments" presumptively disabling (AR 020-23), she proceeded to assess Mr. Stonestreet's RFC to determine whether he could either return to his past relevant work or make an adjustment to other work. (AR 023-28.) *See* 20 C.F.R. § 416.920(a)(4) (setting forth the five-step sequential evaluation process the SSA follows in evaluating SSI claims); *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009). The ALJ assessed Mr. Stonestreet as having, in relevant part, the following RFC:

> He can . . . make simple work[-]related decisions with few workplace changes; have occasional and superficial interactions with the general public; perform no work at a production rate pace such as assembly work, or performing tasks.

(AR 024.) She assessed no other limitations in Mr. Stonestreet's mental functional abilities, e.g., limitations with respect to interacting with supervisors and coworkers, maintaining attention and concentration for extended periods of time, and completing a normal workday and workweek without interruptions from psychologically based symptoms. In discussing the evidence supporting the RFC she assessed, the ALJ considered, *inter alia*, the medical opinions of record, according "[l]imited weight" to the opinions of both Dr. Wynne and the State agency reviewers. (AR 031.)

After determining Mr. Stonestreet's RFC, the ALJ proceeded to find that while Mr. Stonestreet is unable to perform his past relevant work, he is capable of making a successful

adjustment to other work that exists in significant numbers in the national economy. (AR 034-35.) She therefore found that Mr. Stonestreet was not disabled. (AR 035.)

## II. Applicable Law

### A. Standard of Review

Judicial review of the Commissioner's denial of disability benefits is limited to whether the final decision is supported by substantial evidence and whether the Commissioner applied the correct legal standards to evaluate the evidence. 42 U.S.C. § 405(g); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004). "The failure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005) (alteration and quotation marks omitted). In making these determinations, the Court must meticulously examine the entire record but may neither reweigh the evidence nor substitute its judgment for that of the Commissioner. *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007). In other words, the Court does not reexamine the issues de novo. *Sisco v. U.S. Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993). The Court will not disturb the Commissioner's final decision if it correctly applies legal standards and is based on substantial evidence in the record.

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004) (internal quotation marks omitted). Substantial evidence is "more than a scintilla, but less than a preponderance." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record[,]" *Langley,* 373 F.3d at 1118 (internal quotation marks omitted), or "constitutes mere conclusion." *Musgrave v. Sullivan,* 966 F.2d 1371, 1374 (10th Cir. 1992). The Court's examination of the record as a whole

must include "anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005).

## B.    Consideration and Evaluation of Evidence

The ALJ must consider "all relevant evidence in the case record" in making a disability determination. SSR 06-03P, 2006 WL 2329939, at *4 (Aug. 9, 2006).[5] Although an ALJ is not required to discuss every piece of evidence, "[t]he record must demonstrate that the ALJ considered all of the evidence[.]" *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996). The ALJ must discuss not only the evidence supporting her decision but also "the uncontroverted evidence [s]he chooses not to rely upon, as well as significantly probative evidence [s]he rejects." *Id.* at 1010. The ALJ's decision must demonstrate application of the correct legal standards applicable to different types of evidence, and failure to follow the "specific rules of law that must be followed in weighing particular types of evidence in disability cases . . . constitutes reversible error." *Reyes v. Bowen*, 845 F.2d 242, 244 (10th Cir. 1988).

## III.  Discussion

Mr. Stonestreet argues that the ALJ committed reversible error by "improperly rejecting" Dr. Wynne's opinions and breaching her duty to develop the record to clarify ambiguities surrounding the extent of Mr. Stonestreet's neurocognitive disorder. (Doc. 21 at 1-2.) The Commissioner contends that the ALJ's RFC is supported by substantial evidence and that the ALJ reasonably weighed Dr. Wynne's opinions. (Doc. 27 at 2.) The Court agrees with Mr. Stonestreet that the ALJ's decision fails to evince application of the correct legal standards for weighing Dr. Wynne's opinions and that remand is therefore required.

---

[5] The Court acknowledges that certain Social Security Rulings, including SSR 06-03P, that the Court relies on in its analysis have been rescinded effective for claims filed on or after March 27, 2017. *See* SSR 96-2P, 2017 WL 3928298, at *1 (Mar. 27, 2017). However, as noted above, Mr. Stonestreet filed his claim for supplemental security income in 2014 (AR 094), meaning the rescinded rulings and case law interpreting them are still applicable.

**A.	The ALJ did not provide adequate reasons for the weight she assigned to Dr. Wynne's medical opinions and for rejecting certain of his opinions.**

"[W]hen assessing a plaintiff's RFC, an ALJ must explain what weight is assigned to each opinion and why." *Silva v. Colvin*, 203 F. Supp. 3d 1153, 1157 (D.N.M. 2016). In considering the medical opinions of record, the ALJ should generally accord more weight to the opinion of a source who has examined the claimant than to the opinion of a source who has rendered an opinion based on a review of medical records alone. *See* 20 C.F.R. § 416.927(c)(1); *Chapo v. Astrue*, 682 F.3d 1285, 1291 (10th Cir. 2012) ("[A]n examining medical-source opinion is . . . given particular consideration: it is presumptively entitled to more weight than a doctor's opinion derived from a review of the medical record."); *cf. Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004) ("The opinion of an examining physician is generally entitled to less weight than that of a treating physician, and the opinion of an agency physician who has never seen the claimant is entitled to the least weight of all."). "If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96-8P, 1996 WL 374184, at *7 (July 2, 1996). Medical opinions must be weighed using the factors set forth in 20 C.F.R. § 416.927(c), comprising (1) examining relationship, (2) treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors.[6] To be sure, "[n]ot every factor for weighing opinion evidence will apply in every case," SSR 06-03P, 2006 WL 2329939, at *5, and the ALJ is not required to "apply expressly each of the six relevant factors in deciding what weight to give a medical opinion." *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007). Rather, what is required is that the ALJ provide good reasons for the weight she gives an opinion and that her

---

[6] The SSA has issued new regulations regarding the evaluation of medical source opinions for claims filed on or after March 27, 2017. *See* "Revisions to Rules Regarding the Evaluation of Medical Evidence," 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017); 20 C.F.R. 416.927 and 416.920c. Because Mr. Stonestreet filed his claim in 2014, the previous regulations still apply to this matter. *Id.*

explanation is sufficiently specific to make it clear to any subsequent reviewers the weight given to an opinion and the reasons for that weight. *See id*. An ALJ's failure to set forth adequate reasons explaining why a medical opinion was rejected or assigned a particular weight and demonstrate that she has applied the correct legal standards in evaluating the evidence constitutes reversible error. *See Reyes*, 845 F.2d at 244.

### 1.      The ALJ's Discussion of Dr. Wynne's Reports

The ALJ began her discussion of Dr. Wynne's opinions with the following summaries of Dr. Wynne's three reports:

> In 2013, Dr. Wynn[e] said that the claimant had no more than mild problems with understanding, focusing on, and persisting at simple tasks, but that the claimant 'might' have unspecified problems with social interaction. [H]e also endorsed a Global Assessment of Functioning (GAF) score of 45 (i.e., serious symptoms), and indicated that the claimant's mental limitations were caused by both depression and DAA.

> In 2015, Dr. Wynn[e] suggested that the claimant had no limitations except for unspecified problems with social interaction, and equivocal and unspecified problems with adaptation. [H]e again endorsed a GAF of 45, but this time []he said that DAA was the sole cause of the claimant's mental health problems.

> In 2017, Dr. Wynn[e] provided two assessments. In the first, []he ambiguously suggested that the claimant is disabled. [H]e also revised [his] 2015 diagnoses, this time endorsing [a] combination of DAA, depression, and neurocognitive disorder. [His] second 2017 assessment was more detailed. [H]e filled out a checkbox opinion form prepared by the claimant's attorney. In this form, []he suggested that the claimant's level of impairment is so profound that it more than satisfies multiple listings. [H]e also suggested that the claimant has worst-possible ratings in numerous areas, including no useful ability to maintain attention and concentration, to work around others, or to sustain a normal workday or week.

(AR 031 (citations omitted).) Notably, the ALJ's characterizations of Dr. Wynne's findings are not entirely accurate, and the summaries are incomplete in certain critical respects. Before turning to the reasons the ALJ gave for discounting Dr. Wynne's opinions, the Court begins with a brief discussion of the mischaracterizations and deficiencies in the ALJ's discussion of Dr. Wynne's

findings, a recurring problem that bears upon the Court's evaluation of the adequacy of the reasons the ALJ gave for discounting Dr. Wynne's opinions.

Regarding inaccuracies, the ALJ mischaracterized the record in stating that Dr. Wynne found "unspecified problems with social interaction" in 2013 and 2015. In fact, Dr. Wynne opined initially that Mr. Stonestreet "might have difficulty interacting *with his coworkers and his supervisors*" and later that he "could not interact well *with . . . his coworkers*[] *or his supervisors*[.]" (AR 342, 356 (emphases added).) The Social Security Regulations provide that limitations in one's ability to "respond[] appropriately to supervision[ and] co-workers . . . may reduce your ability to do past work and other work." 20 C.F.R. § 416.945(c). Specifically, the abilities to "accept instructions and respond appropriately to criticism from supervisors" and "get along with coworkers or peers without (unduly) distracting them or exhibiting behavioral extremes" are two of the basic mental demands required of unskilled work. Program Operations Manual System ("POMS") § DI 25020.010B.2.c. Thus, Dr. Wynne's specification that Mr. Stonestreet is limited in his ability to interact with coworkers and supervisors is directly on point and certainly specific enough to indicate a relevant mental functional limitation. To the extent the ALJ concluded otherwise and used that as a basis for discounting Dr. Wynne's opinions regarding Mr. Stonestreet's social interaction limitations, such conclusion was incorrect.

Regarding incompleteness, the ALJ's summary of Dr. Wynne's 2017 opinions is materially deficient. Specifically, it fails to acknowledge, much less meaningfully discuss, the particular limitations indicated in the medical source statement that Dr. Wynne completed that bear upon the disability determination in this case and instead generalizes Dr. Wynne's findings, portraying them as extreme, even incredible. As discussed in detail below, the ALJ's treatment of Dr. Wynne's opinions, generally, and those contained in his 2017 medical source statement, specifically, is

problematic because on the explanations provided by the ALJ, which are themselves premised on mischaracterizations and an incomplete account of the record, the Court cannot say that the ALJ applied the correct legal standards in weighing Dr. Wynne's opinions.

### 2. The ALJ's Reasons for Rejecting Dr. Wynne's Opinions

Initially, the Court notes that Dr. Wynne offered opinions on not only Mr. Stonestreet's diagnoses but also his limitations with respect to each of the basic mental demands required in unskilled work as set forth in POMS § DI 25020.010B.2. (AR 342-43, 356, 905-908.) *See* 20 C.F.R. § 416.927(a)(1) (defining "medical opinions" as "statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite your impairment(s), and your physical or mental restrictions"). The ALJ did not reject all of Dr. Wynne's opinions and, indeed, credited and adopted many of them, including diagnoses he made (e.g., depressive disorder and neurocognitive disorder) as well as functional limitations he assessed. Regarding Dr. Wynne's opinions about Mr. Stonestreet's mental limitations, the ALJ apparently agreed with Dr. Wynne's assessment that Mr. Stonestreet is limited in his ability to carry out detailed instructions and, commensurately, included in her RFC that Mr. Stonestreet is limited to making "simple work[-]related decisions[.]" Likewise, Dr. Wynne's opinion that Mr. Stonestreet has a "moderate" limitation in his ability to interact appropriately with the general public is reflected in the ALJ's finding that Mr. Stonestreet can have only "occasional and superficial contact with the general public[.]" Additionally, Dr. Wynne's opinion that Mr. Stonestreet has a "moderate" limitation in his ability to respond appropriately to changes in the work setting is addressed by the ALJ's finding that Mr. Stonestreet is limited to "few workplace changes[.]"

Neither party raises any—and the Court sees no—issue with the ALJ's adoption of these opinions. Rather, Mr. Stonestreet takes issue with the fact that the RFC the ALJ assessed contains "no mention of limitations to simple, unskilled work, ability to concentrate and attend, ability to perform within a schedule or maintain attendance, or ability to interact with supervisors or co-workers." (Doc. 28 at 3.) Mr. Stonestreet argues that the ALJ's reasons for rejecting Dr. Wynne's opinions regarding these functional limitations are inaccurate, as well as legally inadequate. (Doc. 21 at 11.) The Court agrees.

Medical sources often provide opinions on several different issues, and ALJs are not required to adopt or reject a medical source's opinions wholesale. *Cf.* SSR 96-2P, 1996 WL 374188, at *2 (July 2, 1996) ("It is not unusual for a single treating source to provide medical opinions about several issues; for example, at least one diagnosis, a prognosis, and an opinion about what the individual can still do. Although it is not necessary in every case to evaluate each treating source medical opinion separately, adjudicators must always be aware that one or more of the opinions may be controlling while others may not."). However, an ALJ may not "pick and choose among medical reports, using portions of evidence favorable to his position while ignoring other evidence." *Hardman v. Barnhart*, 362 F.3d 676, 681 (10th Cir. 2004). "If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96-8P, 1996 WL 374184, at *7. A medical source's opinion "may be dismissed or discounted, of course, but that must be based on an evaluation of all of the factors set out in [20 C.F.R. § 416.927(c)] and the ALJ must provide specific, legitimate reasons for rejecting it." *Chapo*, 682 F.3d at 1291 (quotation marks and citation omitted). In cases where a medical source renders more than one opinion, "[a]djudicators must use judgment based on the facts of each case in determining whether, and the extent to which, it is necessary to address

separately each medical opinion from a single source." SSR 96-2P, 1996 WL 374188, at *2. An ALJ's failure to adequately explain why a medical source's opinion is being discounted or rejected and to demonstrate compliance with the applicable standards for weighing opinion evidence is grounds for reversal. *See Reyes*, 845 F.2d at 244.

Here, the ALJ did not separately address Dr. Wynne's distinct opinions but instead analyzed his various opinions as a single "opinion." (AR 031-32.) She primarily discounted his "opinion" based on her finding that the "broader record" is "more consistent" with the RFC the ALJ assessed. (*Id.*) She then identified "other relevant factors" that she found supported the "[l]imited weight" she accorded Dr. Wynne's opinions. (AR 032.) The Court considers each of the ALJ's proffered reasons, finding none of them adequate to support her rejection of Dr. Wynne's opinions that she did not account for in her RFC.

### a. Consistency

In discussing her finding that Dr. Wynne's "opinion" was not entitled to greater weight based on its lack of consistency with the other evidence of record, she explained:

> . . . Dr. Wynn[e]'s *opinion* is not consistent with significant aspects of the broader record. For example, []he said that the claimant was still drinking as of July 2017, and that alcohol abuse was causing some of the limitations that []he endorsed. In contrast, the claimant and his mother explained that he stopped drinking in 2016. Some of the claimant's activities are also not entirely consistent with this opinion, such as the evidence about his being able to use public transportation, pursue [Division of Vocational Rehabilitation] retraining, and engage in an impressive variety of mechanical, home improvement, and yardwork projects.

> Furthermore, the overall clinical and treatment record outlined above supports fewer long-term problems than what Dr. Wynn[e] endorsed. As discussed, this evidence generally reflects benign objective findings in areas like alertness, attention, memory, mood, intelligence, and behavior around doctors. This includes clinical findings, and conservative long-term modalities from sources who actually treated the claimant.

(AR 031-32 (emphasis added) (citations omitted).)

Two aspects of the ALJ's explanations are particularly problematic. First, they rest on mischaracterizations of the record and fail to discuss the uncontroverted evidence the ALJ chose not to rely upon and the significantly probative evidence she rejected that tends to undercut her reasons for discounting Dr. Wynne's opinions. *See Clifton*, 79 F.3d at 1010. Second, they fail to tie the evidence cited to the functional limitations assessed by Dr. Wynne. *See* SSR 96-8P, 1996 WL 374184, at *7 ("The RFC assessment must include a discussion of *why* reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." (emphasis added)).

Regarding her characterization of the evidence related to Mr. Stonestreet's alcohol consumption, the ALJ's description is not accurate. Dr. Wynne did not "sa[y] that [Mr. Stonestreet] was still drinking as of July 2017." Nor did Mr. Stonestreet testify at his hearing that he "stopped drinking in 2016." Rather, Dr. Wynne noted in his report that Mr. Stonestreet "said he drinks alcohol occasionally although he has used it excessively in the past[.]" (AR 904.) As to Mr. Stonestreet's testimony, when asked by the ALJ whether he still drinks alcohol, he responded, "No, ma'am. Like once -- . . . -- in a great while," and then stated, "It's been about a year" when asked when he last drank alcohol. (AR 055.) Accurately portrayed, there is nothing inherently inconsistent about what Dr. Wynne noted in his report and what Mr. Stonestreet testified to at his hearing. However, even assuming *arguendo* the existence of an inconsistency in this evidence, the ALJ failed to explain its relevance vis-à-vis her rejection of certain of Dr. Wynne's opinions regarding Mr. Stonestreet's functional limitations. Contrary to the ALJ's finding that Dr. Wynne "said . . . that alcohol abuse was causing some of the limitations that []he endorsed[,]" Dr. Wynne did not relate any of the functional limitations he assessed to "alcohol abuse" specifically. Indeed, Dr. Wynne expressly opined that Mr. Stonestreet's limitations are attributable to "many factor[s]"

including, but in no way limited to, alcohol use disorder. The record supports neither the ALJ's finding that Dr. Wynne attributed any particular limitation(s) to alcohol abuse nor the ALJ's reliance on a purported inconsistency regarding the evidence of Mr. Stonestreet's alcohol use as a basis for rejecting any of Dr. Wynne's opinions.

Next, the ALJ's citation to evidence of Mr. Stonestreet's "activities" fails to adequately support her rejection of Dr. Wynne's opinions because in addition to generalizing and exaggerating the evidence[7], taking it out of context[8], inaccurately describing it[9], and ignoring contrary evidence that indicated the limited nature of those activities[10], she failed to explain its relevance vis-à-vis *relevant* functional limitations that Dr. Wynne assessed.[11] *See id.*; *Sisco v. v. U.S. Dep't of Health & Human Servs.*, 10 F.3d 739, 743 (10th Cir. 1993) (explaining that it is not proper for an ALJ to

[7] It is unclear what the ALJ found so "impressive" about the "variety of mechanical, home improvement, and yardwork projects" that she found evidence of Mr. Stonestreet engaging in. (AR 032.) The records the ALJ cited indicate that Mr. Stonestreet "had to do a lot of yardwork and transplant trees" in May 2015, which landed him in the emergency room with chest pain (AR 357); reported during his diagnostic and psychosocial assessment at St. Martin's in January 2015 that his "Strengths/Resources" were, "I'm always helping out everybody whenever I can. I can't do much. I can clean and cook, do oil changes on anybody's vehicles, [and] I used to do the heater/cooler conversions" (AR 504); did "some repairs" for his mother in May 2016 (AR 569); and had "been doing hard labor outside 'which I'm not supposed to do'" in August 2016, which landed him in the emergency room with chest pain again. (AR 876.) The Court fails to see—and the ALJ failed to explain—how any of the foregoing evidence supports either the ALJ's RFC or her rejection of Dr. Wynne's opinions as "inconsistent" with the "broader record."

[8] *See* n.7 *supra*.

[9] The ALJ found that there was "evidence about [Mr. Stonestreet] being able to . . . pursue [vocational] retraining[.]" (AR 032.) It is true that as early as June of 2016, the record indicates that Mr. Stonestreet expressed interest in returning to school "for more training" through the Division of Vocational Rehabilitation ("DVR"). (AR 546.) However, as of his hearing in August of 2017, Mr. Stonestreet had not made discernable progress towards retraining. While he testified that he "was taking architecture [classes] for a while" and was interested in "taking classes from home[,]" he was not taking any classes at that time and indicated only that he *might* start classes the following semester. (AR 055-56.) Moreover, his mother testified that she did not think he would be able to successfully return to school. (AR 075.) Specifically, she pointed to a class he had taken at Central New Mexico Community College "when he was feeling better" and indicated that "it was very difficult for him to go and to keep up with the course work[] and to make relationships with other students so that he could work with them." (*Id.*) On the record as a whole, the fact that Mr. Stonestreet expressed interest in pursuing vocational retraining—and even took steps to pursue retraining—does not mean that he would be capable of successfully completing it, let alone reentering the competitive workforce.

[10] *See* n.7 *supra*.

[11] The Court recognizes that Dr. Wynne opined that Mr. Stonestreet has a moderate limitation in the ability to "[t]ravel in unfamiliar places or use public transportation[.]" (AR 907.) Thus, evidence that Mr. Stonestreet reported being able to use public transportation (AR 249, 786) could reasonably support the ALJ discounting that opinion; however, the ALJ offered no explanation of the relevance of this evidence in relation to other of Dr. Wynne's opinions that she rejected.

"build [a] factual basis" for her findings by taking the claimant's testimony regarding his or her daily activities "out of context and selectively acknowledging parts of [the claimant's] statements while leaving important segments out"); *see also Krauser v. Astrue*, 638 F.3d 1324, 1332-33 (10th Cir. 2011) (explaining that to determine the probative value of evidence regarding a claimant's activities, "it is necessary to look at the actual activities [the claimant] was talking about" because "the specific facts behind the generalities [may] paint a very different picture"). Just as it was insufficient to point out a purported "inconsistency" in the evidence regarding Mr. Stonestreet's alcohol consumption, the ALJ's citation to a handful of decontextualized activities of daily living supports neither her RFC nor her rejection of certain of Dr. Wynne's opinions.

Regarding the ALJ's finding that "the overall clinical and treatment record outlined above supports fewer long-term problems than Dr. Wynn[e] endorsed[,]" the ALJ provided no explanation of how so-called "benign objective findings" regarding "alertness, attention, memory, mood, intelligence, and behavior around doctors" are inconsistent with and somehow undermine *all* of the functional limitations Dr. Wynne assessed that the ALJ rejected. As Mr. Stonestreet points out (Doc. 21 at 14), many of the medical records the ALJ cited in support of that finding relate to care Mr. Stonestreet received for physical ailments, including chest pain (AR 391-93, 882), an ear abscess (AR 412), and ankle pain (AR 579). It is unclear how an emergency room doctor's notation that Mr. Stonestreet was "[a]lert and oriented to person, place, time, and situation" when he presented with chest pain in March 2015 (AR 392), or an orthopedist's opinion that Mr. Stonestreet's memory was "intact" and that he exhibited "no depression, anxiety" upon being seen at a pre-operative visit in March 2016[12] supports the ALJ's rejection of Dr. Wynne's opinions based on their purported inconsistency with the record as a whole. Even the ALJ's citation

---

[12] The Court notes that one month after the orthopedist's documentation of "no depression, anxiety[,]" Mr. Stonestreet attempted suicide again and had to be hospitalized. (AR 579, 626.)

of more relevant records—such as Dr. Morris's—fails to substantially support her finding because the ALJ impermissibly picked and chose portions of those records to rely on while ignoring evidence that did not support her decision. The ALJ cited Dr. Morris's treatment notes from his second appointment with Mr. Stonestreet in which he documented Mr. Stonestreet's attention and memory as being "W[ithin] N[ormal] L[imits]." (AR 032, 571.) However, the ALJ ignored Dr. Morris's indication of a GAF score of 42, indicating "[s]erious symptoms . . . OR any serious impairment in social, occupational, or school functioning[,]"[13] and his opinion that Mr. Stonestreet has "[s]ignificant limitations in social and occupational functioning." (AR 571-72.) The ALJ's failure to demonstrate that she considered all of the evidence—particularly significantly probative evidence she chose not to rely upon that tended to demonstrate the consistency of Dr. Wynne's opinions with the record as a whole—renders this proffered reason an inadequate basis for rejecting Dr. Wynne's opinions.

As a final matter regarding the ALJ's assessment of the consistency of Dr. Wynne's opinions with the record, the Court briefly addresses the ALJ's finding that "the broader record is more consistent with the above RFC" based on "the rival opinions from both of the State agency mental health specialists" and "the major inconsistencies between Dr. Wynn[e]'s prior and most recent RFC opinions." (AR 031.) Regarding the State agency reviewers' opinions, the ALJ accorded them "[l]imited weight" but explained that they would be "accounted for . . . as additional factors underlying this RFC—i.e., their endorsement of nonseverity supports fewer mental limitations in general than what was alleged." (AR 031.) Relying on *Smith v. Colvin*, 821 F.3d 1264, 1268 (10th Cir.2016), the Commissioner argues that the ALJ reasonably found that Mr. Stonestreet's limitations "landed somewhere between" the "extreme limitations" Dr. Wynne

---

[13] Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders DSM-IV-TR* 34 (4th ed., text rev. 2005).

assessed and the State agency reviewers' opinions that Mr. Stonestreet had "no limitations[.]" (Doc. 27 at 17.) The Commissioner's reliance on *Smith* is misplaced, and the ALJ's explanation is inadequate.

In *Smith*, the Tenth Circuit affirmed the district court's affirmance of an unfavorable disability determination where the record contained conflicting medical opinions regarding the claimant's fingering, handling, and feeling ability and the ALJ "arrived at an assessment between the two medical opinions without fully embracing either one." *Id.* It did so by relying on the approach the Tenth Circuit "upheld" in *Chapo*, 682 F.3d at 1288. *Chapo* held "only that, if a medical opinion adverse to the claimant has properly been given substantial weight, the ALJ does not commit reversible error by electing to temper its extremes for the claimant's benefits." *Id.* at 1288. That is plainly not what happened in this case. Here, the ALJ neither accorded substantial weight to the State agency reviewers' opinions nor tempered those opinions in Mr. Stonestreet's favor. Instead, she accorded "[l]imited weight" to the opinions of the non-examining State agency reviewers but then effectively adopted their opinions which favored her findings over those of Dr. Wynne, an examining source, whose opinions did not. And she did so without adequately explaining her reasons. *See* SSR 96-6P, 1996 WL 374180, at *2 (July 2, 1996) (explaining that "the opinions of physicians or psychologists who do not have a treatment relationship with the individual are weighted by stricter standards" and that "the opinions of State agency medical . . . consultants . . . can be given weight only insofar as they are supported by evidence in the case record, considering such factors as the supportability of the opinion in the evidence including any evidence received at the administrative law judge and Appeals Council levels that was not before the State agency").

Regarding "the major inconsistencies between Dr. Wynn[e]'s prior report and most recent RFC opinions" (AR 031), the ALJ again provided no explanation of the relevance of that observation or how it serves as a basis for her rejection of his opinions. She did not even specify which "major inconsistencies" she found undermined Dr. Wynne's opinions. No one disputes that Dr. Wynne's opinions changed over time, but the mere fact that Dr. Wynne's diagnoses and assessments of Mr. Stonestreet's functional limitations evolved does not necessarily render all of his opinions inconsistent with the record on the whole. Notably, the ALJ's decision reflects no consideration of Dr. Wynne's own explanations of why his opinions changed over time, explanations that tend to provide support for his opinions and thus should have entitled them to greater, not less, weight. *See* 20 C.F.R. § 416.927(c)(3) (explaining that "[t]he better an explanation a source provides for a medical opinion, the more weight we will give that medical opinion"). And as noted previously, it reflects no consideration of the consistency of Dr. Wynne's opinions—particularly those contained in his 2017 mental source statement—with the other substantial evidence of record, e.g., the consistency between Dr. Wynne's opinion that Mr. Stonestreet has limitations in his ability to interact with supervisors and coworkers (AR 907) and Dr. Morris's opinion that Mr. Stonestreet "struggles with . . . avoidance and social withdrawal" and has "[s]ignificant limitations in social and occupational functioning." (AR 570, 572.) This is further evidence that the ALJ failed to apply the correct legal standards in weighing Dr. Wynne's opinions and that she rejected his opinions based on inadequate reasons.

In sum, the ALJ's proffered reasons for finding that Dr. Wynne's opinions are inconsistent with the broader record are legally inadequate to serve as a basis for rejecting them.

### b.    The ALJ's Other Reasons for Discounting Dr. Wynne's Opinions

After concluding her discussion regarding the consistency of Dr. Wynne's opinion with the broader record, the ALJ referred to a number of "other relevant factors" she relied on to support the weight she accorded Dr. Wynne's opinion. The Court briefly addresses in turn each of those "factors," concluding that they also fail to provide adequate explanations for the ALJ's rejection of Dr. Wynne's opinions.

First, the ALJ found that "Dr. Wynn[e] appears to have relied in part on subjective allegations—e.g., [Mr. Stonestreet's] statements about brain damage[.]" (AR 032.) In support, the ALJ specifically cited two medical records she described as "showing no noteworthy brain abnormalities despite the alleged head injuries," and Dr. Wynne's 2013 report, which she described as "alleging childhood brain injuries in 2002-2004." (*Id.*) She also cited generally Mr. Stonestreet's entire medical record "dating back to 2010" but provided no other discussion of the cited evidence or further explanation of this proffered reason for discounting Dr. Wynne's opinions. Setting aside the speculative, equivocal nature of the finding itself, there is nothing in the record to support the ALJ's implicit conclusion that *all* of Dr. Wynne's opinions flowed from his purported reliance on Mr. Stonestreet's reports of head injuries he suffered in childhood and, thus, were discountable. Nothing in any of Dr. Wynne's reports or in his 2017 medical source statement ties any, let alone all, of his opinions regarding Mr. Stonestreet's specific functional limitations to "brain damage" as opposed to another impairment, e.g., persistent depressive disorder, that Dr. Wynne diagnosed. Indeed, Dr. Wynne's most recent report makes clear that he *did not* attribute any of Mr. Stonestreet's limitations to a particular impairment and in fact found this to be "a complicated case with many factor[s] contributing to Duane's disability." (AR 905.) On the record as a whole, Dr. Wynne's purported reliance on Mr. Stonestreet's "subjective

allegations" regarding "brain damage" is not an adequate reason for the ALJ to discount or otherwise reject his opinions.

Second, the ALJ found it to be "noteworthy" that, as she described it, Dr. Wynne "explained that []he incorporated physical and non-medical factors into [his] opinion." (AR 032.) The ALJ did not specify what she meant by this or to what "physical and non-medical factors" she was referring. Instead, she commented that Dr. Wynne "is a Ph.D. rather than an M.D., [his] specialization only applies to mental health, and []he did not actually perform a physical examination." (*Id.*) The Commissioner contends that the ALJ "was referring to the last paragraph of Dr. Wynne's opinion, which stated that . . . [Mr. Stonestreet's] depression was exacerbated by back pain resulting from a fall with spine fractures and life circumstances, including homelessness[.]" (Doc. 27 at 20-21.) According to the Commissioner, because "specialization" is one of the factors considered in determining what weight to accord a medical opinion, "it [was] reasonable for the ALJ to note that Dr. Wynne opined on issues outside his psychology specialty." (*Id.* at 20.) Setting aside the post hoc nature of the Commissioner's explanation, *see Haga v. Astrue*, 482 F.3d 1205, 1207-08 (10th Cir. 2007) (explaining that reviewing courts "may not create or adopt post-hoc rationalizations to support the ALJ's decision that are not apparent from the ALJ's decision itself"), the Commissioner cites no authority supporting his apparent contention that Dr. Wynne's passing reference to Mr. Stonestreet's broken back as a precipitating cause of his depression in adulthood constitutes an opinion on an issue outside of his specialty that serves as a basis for discounting all of his medical opinions of record. The record is clear that Dr. Wynne diagnosed only *mental* impairments and offered opinions regarding only *mental* functional limitations, i.e., opinions squarely within his specialization that in fact should have entitled his opinions to greater, not less, weight. *See* 20 C.F.C. § 416.927(c)(5) ("We generally give more

weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist.")). This "factor" is also not valid.

Third, and seizing upon Dr. Wynne's statement in his 2017 report that Mr. Stonestreet's depression "has been exacerbated by . . . his life circumstances, i.e., homelessness"[14] (AR 905), the ALJ commented that "an RFC is based on long-term medical impairment rather than on acute or non-medical variables like housing or financial stress[.]" (AR 032 (citing Dr. Wynne's 2017 report).) While true that the existence of a medically determinable impairment that can be expected to last for a continuous period of not less than twelve months is a necessary precondition to a determination of disability, *see* 20 C.F.R. § 416.905(a), the record in no way supports the ALJ's suggestion that Mr. Stonestreet's depression—or any other diagnosed mental impairment—was temporary and failed to meet the twelve-month duration requirement. Mr. Stonestreet was repeatedly diagnosed with and treated for depression starting in early 2015 and continuing through the date of his hearing. Nothing in the record even remotely suggests that the cause or causes of Mr. Stonestreet's depression and/or other impairments was or were expected to sufficiently resolve within the next twelve months such that Mr. Stonestreet would no longer be impaired. On this record and on the ALJ's failure to explain the relevance of her statement regarding the required duration of medical impairment, this is also an inadequate reason for discounting Dr. Wynne's opinions.

Finally, the ALJ's statements that (1) Dr. Wynne "endorsed obsolete versions of the listings[,]" rendering his "corresponding opinions . . . off-topic[,]" and (2) to the extent he

---

[14] The record contains uncontroverted evidence that Mr. Stonestreet experienced homelessness and housing instability on a regular basis beginning as early as 2011 and no later than 2012, i.e., for five to six years as of his hearing. (*See, e.g.*, AR 503, 546, 567, 626.)

"endorsed 'disability'," his opinion "is off-topic" also fail as reasons for rejecting Dr. Wynne's opinions. Dr. Wynne's opinions covered much more than whether Mr. Stonestreet met any of the listings or was "disabled." At most, Dr. Wynne's purported lack of familiarity with SSA standards and definitions and endorsement of "obsolete versions of the listings" could support the ALJ's rejection of Dr. Wynne's opinions indicating that Mr. Stonestreet met the listing for affective disorders and anxiety-related disorders (*see* AR 020-23), something Mr. Stonestreet does not challenge. (*See* Doc. 21.) Regarding Dr. Wynne's purported endorsement of "disability," even assuming *arguendo* that Dr. Wynne's statement that this is "a complicated case with many factor[s] contributing to Duane's disability" could reasonably be construed as an opinion on an issue reserved to the Commissioner, the ALJ was still required to "carefully consider" that opinion and could not simply ignore it. *See* SSR 96-5P, 1996 WL 374183, at *2-3 (July 2, 1996) ("[O]ur rules provide that adjudicators must always carefully consider medical source opinions about any issue, including opinions about issues that are reserved to the Commissioner. . . . [O]pinions from any medical source on issues reserved to the Commissioner must never be ignored. . . . In evaluating the opinions of medical sources on issues reserved to the Commissioner, the adjudicator must apply the applicable factors in 20 C.F.R. 404.1527([c]) and 416.927([c])."). Yet, she failed to do so. The ALJ likewise failed to provide any explanation of how Dr. Wynne's statement regarding Mr. Stonestreet's "disability" implicates the weight that should be accorded to his medical opinions regarding Mr. Stonestreet's functional limitations.

In sum, the explanations the ALJ provided regarding the "other relevant factors" she cited in support of the weight she accorded Dr. Wynne's opinions are insufficient to allow the Court to follow her reasons for rejecting Dr. Wynne's opinions that indicated greater mental functional limitations than those assessed by the ALJ.

**B.     The ALJ's Failure to Develop the Record**

Because remand is required as set forth above, the Court does not address the merits of Mr. Stonestreet's argument that the ALJ failed to develop the record as to his neurocognitive disorder. *See Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003) (explaining that the reviewing court need not reach issues raised that "may be affected by the ALJ's treatment of th[e] case on remand").

## IV.     Conclusion

For the reasons stated above, Mr. Stonestreet's Motion to Reverse and Remand for a Rehearing with Supporting Memorandum (Doc. 21) is GRANTED.

IT IS SO ORDERED.

_____
KIRTAN KHALSA
United States Magistrate Judge
Presiding by Consent